# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No.:  22-cr-00238 (TNM)** |
| | : | |
| **LISA HOMER** | : | |
| **a.k.a. LISA BOISSELLE,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S AMENDED SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Lisa Homer, née Boisselle, to thirty days incarceration, thirty-six months' probation, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

## I.    Introduction

The defendant, Lisa Homer, a financial planner, traveled from Arizona to participate in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than one million dollars of property damage.

On August 9, 2022, Homer will be pleading guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, a period of incarceration is appropriate in this case because Homer, while wearing a camouflage patterned helmet, goggles, and a ballistic vest with a rifle plate, entered the Capitol through the breached Senate Wing Door among a large group of rioters who overwhelmed police officers; joined a large group of rioters inside the

Crypt; entered an area between the east side of the Crypt and the escalators/staircase that lead down to the Capitol Visitor Center, [1] which police were trying to secure when rioters blocked police from closing a large "garage-style" door; remained inside the Capitol for approximately one hour; and then provided the FBI with "excuses" in an attempt to justify or minimize her involvement with the riots.   Homer's conduct merits a sentence of incarceration.

The government respectfully implores the Court to consider that Homer's conduct on January 6, like that of thousands of others, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings therein.  But for Homer actions alongside so many others, the riot likely would have failed to breach the Capitol building and delay the election certification vote for hours.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.  The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, Homer's participation in a riot that actually succeeded in halting the Congressional certification combined with the time Homer spent in the Capitol and being dressed for combat makes a period of incarceration appropriate in this case.

## II.     Factual Background

### A.     The January 6, 2021 Attack on the Capitol

As the Court is aware, on January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers from the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD"), among other forces, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and the

---

[1] The area is directly below the foyer/entryway that sits between the Rotunda and the East Rotunda Door/Columbus Door on the east side of the Capitol. Before the rioters got to the area, USCP was using it as a staging area of sorts to rest and provide assistance to officers on the West Plaza.

rioters ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

The general summary of the attack on the U.S. Capitol is set forth in the Statement of Offense, at 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Homer's conduct and behavior on January 6.

### Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

The West Front of the Capitol Grounds is depicted in Government's **Exhibit 1**. This is where the rioters first assaulted police and made their  entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the USCP's defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



**Exhibit 1[2]**

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]"  Between 12:45 and 1:00 p.m., the crowd gathered at the barricades where the police were vastly outnumbered; the mob breached the outer perimeter by jumping over and pushing down the bicycle-rack barricades and shoved USCP police officers out of the way at both the first and second police barriers, entering the restricted area and ultimately flooding the "West Plaza."

On the West Plaza, police officers were faced with a fast growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the West

---

[2] Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.

Plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site, as depicted in Government's **Exhibits 2A-B**, **3,[3]** and **3A-B**.



Exhibit 2A                                                    Exhibit 2B[4]



Exhibit 3A                                                    Exhibit 3B[5]

Following the conclusion of President Trump's speech on The Ellipse, at approximately 1:15 p.m., the crowd began to grow as many people moved to the Capitol grounds. By 2:03 p.m., Metropolitan Police Department officers responded to USCP officers' calls for help, broadcasting a dispersal order to the crowd. The order began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

---

[4] Exhibits 2A-B are stills from USCP security footage showing the progression of the crowd from the outer barricades to the West Plaza (2B).

[5] Exhibit 3 is a time lapse video from USCP security footage showing the progress of the breach of the West Plaza, where USCP and MPD attempted to defend their ground. Exhibits 3A-B are stills from that USCP security footage.

This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning, the deployment of riot control agents, and impact weapons, few members of the crowd left.  In fact, the mob in the restricted area continued to grow as crowds streamed towards the West Plaza. The area looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles, making it difficult for officers defend themselves. By 2:28 p.m., with their situation untenable a general retreat was called, and several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage, as depicted in Government's **Exhibits 4A-B**.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



**Exhibit 4A**



**Exhibit 4B**[6]

### B.  HOMER'S CONDUCT

### *Homer's Conduct Prior to January 6, 2021*

Homer's Instagram screen name is "laboisselle27."  On October 30, 2020, Homer posted **Exhibit 5** on Instagram, depicting an individual holding a bundle of dynamite. Homer wrote the caption, "Let'sblowshitup." [*sic*]



**Exhibit 5**

---

[6] Exhibits 4A-B show the breakthroughs in the defensive line on both the left and right flanks caused the entire police line to collapse and individual officers were swallowed by the crowd, and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage.

Homer traveled to Washington, D.C.[7]  On November 14, 2020, the Proud Boys[8] and various groups gathered in Washington, D.C. for the "Million MAGA March" to demonstrate their unhappiness with the 2020 presidential election results.   Homer participated in this event.   On November 15, 2020 and November 19, 2020, Homer posted images depicted in **Exhibits 6A-C**, on her Instagram account from the November 14, 2021 the "Million MAGA March" in Washington, D.C.  **Exhibit 6C**  shows an individual in a Proud Boys tee shirt.



| **Exhibit 6A** | **Exhibit 6B** | **Exhibit 6C** |

On December 20, 2020, Homer posted **Exhibit 7** on her Instagram page.   This is an emblem associated with the Proud Boys nationalist organization.

---

[7] Investigation revealed that Homer departed Phoenix for Washington, D.C., on November 13, 2020. Homer returned from Washington, D.C. to Phoenix, Arizona, on November 15, 2020.

[8] Proud Boys are a self-described "Western Chauvinist" fraternal organization, some of whose members have committed violence against perceived adversaries at First Amendment-protected events in the United States. The Proud Boys are a national organization with many, largely autonomous U.S. chapters and some activity in other Western countries. The group has an initiation process for new members, who often wear yellow and black polo shirts or other apparel adorned with the Proud Boys logo to events.



**Exhibit 7**

***Homer's Role in the January 6, 2021 Attack on the Capitol***

Homer flew from Phoenix on January 3, 2021, to Washington D.C.  On January 6, 2021, Homer entered the U.S. Capitol Building for approximately one hour.  During that time, she moved throughout the building, while wearing a camouflage-patterned helmet, goggles, and a ballistic plate-carrier vest.

The New York Times assembled video segments taken from numerous sources to produce a video entitled Day of Rage: How Trump Supporters Took the U.S. Capitol.  The New York Times video is **Exhibit 8**, which has been provided to the Court, and can be found on-line.[9]

**Exhibit 8A** shows a still photograph from the New York Times video, depicting Homer circled in red at 07:19 into the video as part of the crowd on the National Mall marching towards the Capitol building (the Smithsonian Castle can be seen in the background).  Homer appears to be walking with/near members of the Proud Boys.

---

[9] https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html



**Exhibit 8A**

**Exhibit 8B** depicts the crowd of protesters forcefully push through the first police line. At 12:04 into the New York Times video, Homer can be seen at the front of the protest line participating in confronting and taunting Capitol Police at the West steps.



**Exhibit 8B**

**Exhibit 8**C depicts Homer at 12:34 into the video, while Congress was still in session. William "Billy" Chrestman, one of the Proud Boys leaders, incited the crowd chanting "who's house is this?" The crowd responded by yelling "our house." Homer was standing next to Chrestman participating in the chanting. Referring to the Capitol, Chrestman yelled, "who's house is it?" Homer and others responded, "our house!" Then Chrestman yelled "do you want your house back?" Homer yelled "yes" in response. Chrestman then yelled, "take it."[10] As Homer yelled, she looked over her left shoulder towards the crowd, shortly before

---

[10] Chrestman and five other co-conspirators have been charged in case 21-cr-00160-TJK, in which this "call and response" exchange is referenced in paragraph 36 of the public indictment.

the Capitol building was attacked.



**Exhibit 8C**

Homer wore dark-colored pants; a dark-colored hoodie,[11] with a white American flag on the right sleeve and a white crossed rifle emblem on the left sleeve; and tan, tactical-style gloves. Homer had a dark colored gator mask around her neck. She wore an olive-drab, green-colored wraparound outer carrier vest (designed to hold ballistic body armor) showing the outline of a protective rifle plate inside of the front compartment.[12] There is a tan square patch with dark writing "Lions Not Sheep" on the right side of the outer carrier front flap. A square camera, possibly a GoPro, is attached to the center of the outer carrier directly below Homer's chin, and she held a cellular phone. Homer also wore a white knitted beanie with tan trim and a black patch sewn onto the front that states, "Lions Not Sheep" as seen in **Exhibits 9A-C.**

---

[11] Prior to January 6, 2021, the Proud Boys communicated about dressing in black on that day, as referenced in paragraph 12 of the indictment in 21-cr-00160-TJK.
[12] On January 6, 2021, Chrestman and others wore vests similar to Homer's vest.



**Exhibit 9A**



**Exhibit 9B**                         **Exhibit 9C**

Prior to entering the Capitol building Homer pulled up the gator that was around her neck so that it covered her mouth and nose, as depicted in **Exhibit 10A-B**[13] below. Homer also put on dark color goggles

---

[13] **Exhibit 10B** is taken from USCP security footage.

and a protective helmet with a green camouflage pattern, before entering the Capitol.  This demonstrates she was expecting violence and voluntarily went inside the U.S. Capitol building.

 

**Exhibit 10A**                    **Exhibit 10B**

Homer entered the U.S. Capitol Building through the damaged Senate Wing Door, which was breached at approximately 2:15 p.m., which can be seen in **Exhibit 11**, USCP security footage provided to the Court.  **Exhibits 11A-B** are stills from Exhibit 11 and show Homer held her phone up and appears to have recorded or photographed her surroundings, which includes the broken-out glass from the window that is on the floor.



**Exhibit 11A**                    **Exhibit 11B**

**Exhibits 12A-C** are taken from USCP security footage, showing Homer inside of the Crypt area of the Capitol.  This is believed to be after the police line in the Crypt is overrun by the mob.



**Exhibit 12A**                         **Exhibit 12B**



**Exhibit 12C**

Homer also entered an area where police were trying to close a "garage style" door.  In that area, rioters violently overthrew the police by throwing chairs and garbage cans and using chemical irritants on police.  This violence is demonstrated in **Exhibit 13**,[14] a USCP security video, which has been provided to the Court.  It is clear from the video that Homer witnessed the debris on the floor and watched rioters raise one of the overhead doors.  **Exhibit 13A** is a still from the video.



**Exhibit 13A**

---

[14] Homer is visible on the USCP security footage video from timestamp 11:50 through the end.

Through legal process, FBI determined that Homer stayed at the Grand Hyatt Hotel from January 5 through 7, 2021.  Investigation of known Proud Boys members revealed some of them also stayed at the Grand Hyatt on and about January 6, 2021.  On January 8, 2021, HOMER left Washington D.C. to travel back to Phoenix.

### Homer's Conduct After January 6, 2021

On January 27, 2021, HOMER posted **Exhibit 14** on her Instagram page of a map of Michigan, and Homer wrote the caption, "Stolenelection" [*sic*]



**Exhibit 14**

In October 2021, Homer posted **Exhibit 15**, placing herself in Washington, D.C. during the Proud Boys November 2020 event, with the caption, "Last November I was led to go to DC to stand for our liberties…."

16



**Exhibit 15**

In November 2021, the FBI executed a search warrant at Homer's residence.  As depicted in **Exhibits 16A-M,** during the search, agents found items Homer wore on January 6, 2021, including the helmet, sweatshirt, white beanie bearing a "Lions Not Sheep" patch, goggles, ballistic vest, and backpack.  Inside that backpack were the tan gloves and neck gaiter Homer wore on January 6, 2021, as well as a flashlight and a glass breaking device (described as "MTP-6 Tactical Pen – Military-Inspired Multitool Pen").[15]  FBI also found a Proud Boys sweatshirt, firearms,[16] and a book about QAnon.[17]

---

[15] https://www.amazon.com/dp/B07DY4J11S/ref=sspa_dk_detail_2?psc=1&pd_rd_i=B07DY4J11S&pd_r d_w=GJQhz&content-id=amzn1.sym.3481f441-61ac-4028-9c1a-7f9ce8ec50c5&pf_rd_p=3481f441-61ac-4028-9c1a-7f9ce8ec50c5&pf_rd_r=GTZ595V27S6ARY7YGAJV&pd_rd_wg=MhZsV&pd_rd_r=5c0e3334-a522-49c1-a2ab-daf4905a1b1a&s=sporting-goods&sp_csd=d2lkZ2V0TmFtZT1zcF9kZXRhaWxfdGhlbWF0aWM&spLa=ZW5jcnlwdGVkUXVhbGl maWVyPUFSSDVOOFNBUTRUMjUmZW5jcnlwdGVkSWQ9QTAzMzI4MThYSzZTQkhXTUJBT0E mZW5jcnlwdGVkQWRkQWRJZD1BMDk4NzkyNTEwR1YxMUxZMkhaUzQmd2lkZ2V0TmFtZT1zcF9kZX RhaWxfdGhlbWF0aWMmYWN0aW9uPWNsaWNrUmVkaXJlY3QmZG9Ob3RMb2dDbGljaz10cnVl

[16] Phoenix Arms Raven .25 caliber handgun and Crusader AR-15 style semi-automatic rifle.  The firearms were not seized.

[17] An American political conspiracy theory and political movement.  It originated in the American far-right political sphere in 2017.  QAnon centers on false claims made by an anonymous individual or individuals known as "Q".  Those claims have been relayed, developed and supplemented by numerous communities and influencers associated with the movement.



**Exhibit 16A**

**Exhibit 16B**

**Exhibit 16C**

**Exhibit 16D**

**Exhibit 16E**

**Exhibit 16F**



**Exhibit 16G**



**Exhibit 16H**                                    **Exhibit 16I**



**Exhibit 16J**                    **Exhibit 16K**



**Exhibit 16L**                    **Exhibit 16M**

### *Defendant's Interview*

The FBI interviewed Homer in November 2021 at the FBI filed office in Colorado Springs, Colorado.[18]   Homer acknowledged that she was in Washington, D.C. on January 6, 2021.  Homer stated that she was there "to be a patriot" and that she was "in the wrong place at the wrong time."  Homer stated that rubber bullets were fired at her.  Homer rationalized the fact that she wore helmet by telling the FBI it was  to protect herself since she suffered a traumatic brain injury from a prior incident.  Homer also claimed

---

[18] Homer was allowed to turn herself in, have her initial appearance the same day, and then released; she served no time in custody.

that she used to be a lobbyist and has worked inside the U.S. Capitol in the past.  Homer also acknowledged

that she was in Washington, D.C. in November 2020 for another rally.

### The Charges and Plea Agreement

On November 15, 2021, Homer was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1)

and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).   On July 12, 2022, Homer was charged by Information

with a violation of 40 U.S.C. § 5104(e)(2)(G).  On August 9, 2022, Homer is scheduled to plead guilty to

the Information, charging her with a violation of 40 U.S.C.  § 5104(e)(2)(G).  By plea agreement, Homer

agreed to pay $500 in restitution.

### III.    Statutory Penalties

Homer faces sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G).  As noted by the

plea agreement, Homer faces up to six months of imprisonment and a fine of up to $5,000.[19]  Homer must

also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v.*

*Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the

Sentencing Guidelines do not apply. 18 U.S.C.  § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors

a court must consider in formulating the sentence. Some of those factors include: the nature and

circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for

the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the

need for the sentence to afford adequate deterrence,  § 3553(a)(2)(B); and the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar conduct.

---

[19] Because Homer will plead guilty to a petty offense, a term of supervised release is not authorized. *See* 18
U.S.C. § 3583(b)(3).

§ 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of thirty days incarceration, thirty-six months' probation, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history that defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices.  Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with police officers and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Moreover, each defendant who breached the Capitol was part of the mob.  As Homer joined the mob, she identified with those around her.  As a Proud Boys leader yelled "do you want your house back?" Homer yelled "yes" in response.  Homer entered the Capitol donned in a camouflage helmet, goggles, and ballistic vest, moving throughout the Capitol.  When the backpack she carried on January 6 was search, the FBI found a glass-breaking device inside.  Homer's "presence was part of the floodwaters that drowned the Capitol in insurrection and destruction." *United States v. Jesus Rivera*, No. 21-060 (CKK) (Jun. 17, 2022) ECF No. 62, pg. 15.

Additionally, while looking at Homer's individual conduct, the Court should look to a number of aggravating and mitigating critical factors, to include: (1) whether, when, how the defendant entered the

Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  Had Homer personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Homer's part is therefore not a mitigating factor in misdemeanor cases.

Homer, while wearing a camouflage patterned helmet, goggles, and a ballistic vest with rifle plate, entered the Capitol through the breached door, adjacent to broken windows, among a large group of rioters who overwhelmed police officers; joined a large group of rioters inside the Crypt; joined a group of rioters whose "call and response" chanting demonstrated that they believed they were entitled to break the law, entered an area that the police were trying to secure and rioters blocked police from closing a large "garage-style" door; remained inside the Capitol approximately one hour; and then provided the FBI with "excuses" in an attempt to justify or minimize her involvement with the riots.

Homer's statements to the FBI demonstrates a lack of recognition of both wrongdoing and remorse. Homer wasn't in the "wrong place at the wrong time."  She chose to fly all the way across the country to join in the events of January 6.  She chose to march from the Ellipse to the Capitol (approximately 1.5 miles).  She chose to wear a ballistic vest.  Homer chose to change into a helmet and googles before transitioning from the exterior West Plaza grounds to the inside of the Capitol building.  This suggests Homer went ready for battle and/or violence.  Had Homer been concerned about rubber bullets and or a

head injury, she should have stayed out of the mob of rioters who illegally entered the U.S. Capitol.  Further, if Homer really had worked in the Capitol in the past, then she of all people would know that the Capitol is not to be entered through the Senate wing door, while sirens were blaring, and broken glass lay strewn about. She would have known that the proper way to enter the U.S. Capitol is through an official point of entry, with the required credentials, and only after going through essential security.

### B.  The History and Characteristics of Homer

Homer has no known criminal history.[20]

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[21] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[20] Because the Court waived preparation of the Presentence Investigation Report in this case, it is not clear whether Homer has any criminal history that the probation office may have found had it conducted an investigation.

[21] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending

what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).

It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider. *See United States v. Mariposa Castro,* 21-cr-299-RBW, Tr. 2/23/2022 at 41-42. ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.") (statement of Judge  Walton).

*Specific Deterrence*

The need for the sentence to deter Homer from future, similar criminal conduct  also weighs heavily in favor of a jail sentence.  On January 6, Homer wore a ballistic vest, was at the front line of rioters on the West Plaza, and she continued to move throughout the Capitol despite witnessing evidence of destruction was illegal and concerning. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.  It didn't come when he went home.  It came when he realized he was in trouble.  It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.  It came when he realized that he could go to jail for what he did.  And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to

assault on police officers, to conspiracy to corruptly interfere with Congress.[22] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[23] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (similar statement by Judge Friedman).

Homer will plead guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however. As

---

[22] Attached to this sentencing memorandum is a table that provides additional information about the sentences imposed on other Capitol breach defendants to date. The table demonstrates the sentence requested here would not result in an unwarranted sentencing disparity.

[23] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the attached chart demonstrates, a term of incarceration has been imposed for defendants similarly charged and situated to Homer.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), and whether he has prior military service—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).""). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of

28

violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, judges of this court have sentenced to a term of incarceration Capitol breach defendants who Paraded, Picketed, or Demonstrated  within the Capitol.  Many of these defendants also went to D.C. prepared for the riot, were close to violence against police, or participated in screaming and chanting.

In *United States v. Nicholas Perretta and Mitchell Vukich*, 21-cr-539-TSC, the court imposed 45 days incarceration for each defendant based on their entry in the Capitol after witnessing violence and wearing protective eyeglasses.  They were inside the Capitol for less time than Homer and was not wearing a helmet and ballistic vest, as Homer did.  In *United States v. Phillip Kramer*, 21-cr-413-EGS, the court imposed 30 days incarceration based on his entry into the Capitol and bringing a helmet with him in anticipation for violence.  He did not have goggles and a ballistic vest, as Homer did.  In *United States v. Jordan Revlett*, 21-cr-281-JEB, the Court sentenced the defendant to 14 days incarceration for entering the Capitol, recording the events he witnesses, and posting his recordings to social media.  Homer appears to have taken photos or videos while she was inside the Capitol.  Revlett did not come prepared for the riot the way Homer did.  A sentence similar to or greater than these four defendants is appropriate for Homer.

In *United States v. Robert Reeder*, 21-cr-166-TFH, the defendant was sentenced to 90 days' incarceration for entering the Capitol after witnessing the remnants of the breach of the Capitol grounds and building, as well as screaming and chanting.  Homer, came to the Capitol clad in combat gear and personally participated in the chanting on the West Plaza of the Capitol to take back "our house."  In *United States v. Virginia Spencer*, 21-cr-147-02-CKK, the defendant, who had previous misdemeanor conviction, was

sentenced to 90 days' incarceration for entering the Capitol, going with the mob into the Crypt, Speaker's suite, and outside the House Chambers, and then minimizing her conduct when interviewed by the FBI. Notably, Spencer walked with or near Proud Boys towards the Capitol as that white nationalist group chanted.  Homer entered the Capitol (although did not go into the Speaker's suite), minimized her conduct when interviewed by the FBI, and personally participated in the Proud Boys' "call and response" on the West Plaza.  A sentence similar to these defendants is appropriate for Homer.

In *United States v. Mish*, 21-cr-112-CJN, the court imposed 30 days incarceration.  Mish traveled from Wisconsin to Washington, D.C.; only spent 29 minutes inside the Capitol; and like Homer, did not go into sensitive areas of the Capitol.  Mish did have previous law enforcement contacts for traffic violations and two 20-year-old convictions.  Mish, like Homer, did not engage in the destruction of property or assault of police officers.  Homer, unlike Mish, came to the Capitol clad in combat-style gear and had associations with a nationalist organization.

In *United States v. Little*, 21-cr-315-RCL, the court imposed 60 days incarceration.  Little traveled from North Carolina to Washington, D.C.; entered the Capitol; and like Homer, did not enter sensitive areas of the Capitol. Little did have previous traffic violations.   Little, like Homer, did not engage in the destruction of property or assault of police officers.  Homer, unlike Little, came to the Capitol clad in combat-style gear and had associations with the Proud Boys.

In *United States v. Andrew Ericson*, 21-cr-506-TNM, this Court imposed a sentence of 20 days' intermittent incarceration as a condition of probation, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence.  You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it." *Ericson,* Tr. 12/10/21 at 21.  This Court concluded that entering offices put Ericson in a "different category" than

30

people "who were only in areas that would normally be open for tours." *Id.* While Homer did not enter a Congressional office, she did go into areas that are not part of the areas of the Capitol that would have been open to the public had the building been open for tours.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The government requests a split sentence and the Court can impose a split sentence

For the reasons set forth in Judge Lamberth's opinion in *United States v. Little*, No. 1:21-CR-315-RCL, __ F. Supp. 3d __, 2022 WL 768685 (D.D.C. Mar. 14, 2022), this Court has authority to impose a "split sentence"—"a period of incarceration followed by period of probation." Other judges have made similar findings.  *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States*

*v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); United States v. Revlett, 21-cr-281 (JEB), (D.D.C. July 7, 2022) (imposing split sentence). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

## VI.    A sentence imposed for a petty offense may include both incarceration and probation.

### A. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[24] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized

---

[24] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[25]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

---

[25] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

### B.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive

modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition

on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.

Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Homer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

VII. **A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

A. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.  Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[26]

B. *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at

---

[26] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[27]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VIII.  Conclusion

Homer's conduct  before (social media posts and attendance at a Proud Boys rally); during (wore a ballistic vest, helmet and goggles; at the front line on the West Plaza, yelling at/near the police, with members of the Proud Boys; entered the Capitol at the broken Senate Wing Door in the line of sight of broken glass; and moved through the Capitol for approximately and hour); and after (additional social media posts indicating a continued disbelief in the legitimacy of the 2020 election) January 6  warrants a period of incarceration. Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Lisa Homer to thirty days incarceration, thirty-

---

[27] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

six months' probation, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing a jail sentence, but not for a lengthy period, as a consequence of her behavior, while recognizing her acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052


*/s/ Jacqueline Schesnol*
JACQUELINE SCHESNOL
AZ Bar No. 016742
Detailee to the U.S. Attorney's Office
to the District of Columbia
Washington, D.C. 20530
(602) 514-7500
jacqueline.schesnol@usdoj.gov